UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


H.D.V. - GREEKTOWN, LLC, 415 EAST
CONGRESS, LLC, and K & P, INC,
f/d/b/a/ Deja Vu, d/b/a Zoo Bar,

                                                    Case number 06-11282
                    Plaintiff,

                                                    Honorable Julian Abele Cook, Jr.
v.

CITY OF DETROIT,

                    Defendant.


<u>ORDER</u>

The issue before this Court relates to a challenge by the Plaintiffs, H.D.V. - Greektown,

LLC ("HDV"), 415 East Congress, LLC, and  K& P, Inc. ("K&P"),[1] to the constitutionality of a

municipal zoning ordinance which, in their view, has effectively prevented them from operating

a legitimate business enterprise.  The Defendant, City of Detroit, disagrees.

I.

One of the Plaintiffs,  K&P, Inc. has operated a bar and nightclub  since 1986 in a building

structure that is owned by another Plaintiff, 415 East Congress, LLC, in downtown Detroit,

Michigan. K&P possesses (1) a Class C liquor license, as well as a topless activity permit that had

been issued by the Michigan Liquor Control Commission, and (2) a Cabaret D license that had been

issued by the City of Detroit. These licenses have enabled K&P to offer female topless dance

_____

        [1]Unless the Court utilizes any language to the contrary within the text of this order, the
Court will identify the moving parties, H.D.V.– Greektown L.L.C., 415 East Congress, L.L.C.,
and K & P, Inc., as "the Plaintiffs."

entertainment to the general public since 1997.

The City of Detroit amended its zoning ordinance in 1999 in an effort to preclude the establishment of new adult businesses on "B6" zoned properties within the central business district. Inasmuch as K&P's business enterprise was located on a "B6" zoned property within the central business district of Detroit, its topless entertainment business became a non-conforming use of the property. However, K&P's business, despite falling within the parameters of this new zoning ordinance, was "grandfathered in" and permitted to continue as a lawful non-conforming use pursuant to Section 51.0000 of the City of Detroit's zoning ordinance.[2]

On October 2, 2002, HDV entered into a conditional purchase agreement to acquire all of K&P's assets, including its liquor license, topless activity permit, and Cabaret D license. In 2003, HDV submitted an application to the City of Detroit, seeking approval of the projected transfer of the K&P licenses. However, this transfer application was delayed for several years.[3]

During the early part of 2004, K&P sought approval from the City of Detroit to erect a sign which advertised the club's new name, "Deja Vu." When approval for that sign was not forthcoming, K&P, after changing the name of its establishment to "Hustler," applied for another sign permit in December 2004.[4]

On March 28, 2006, the Plaintiffs, feeling aggrieved, filed this lawsuit as a formal challenge

---

[2]The then-operative Detroit Zoning Ordinance 51.0000 stated, in pertinent part, that "(a)ny nonconforming building, structure, or use, lawfully existing on the effective date of this Ordinance and which remains nonconforming . . . may be continued, operated, occupied, or maintained subject to the provisions of this article."

[3]The City of Detroit, through its legislative branch (i.e., the City Council) turned its attention to HDV's request for an approval of the projected transfer of the K&P licenses in November 2006, and, thereafter, voted to reject its transfer application.

[4]The City of Detroit concedes that it did "not immediately act on such requests." Brief, Defendants' Second Summary Judgment at 1.

to the constitutionality of various provisions within the City of Detroit's zoning ordinances and municipal code. On April 18, 2007, the Plaintiffs filed a second motion for the entry of a partial summary judgment,[5] seeking to obtain the issuance of an order that would (1) declare the City of Detroit's sign ordinances to be unconstitutional; (2) permanently enjoin the enforcement of these provisions by the City of Detroit; (3) determine that they are legally entitled to erect those signs which were described on their permit application; and (4) permanently restrain the City of Detroit from preventing them from erecting the signs that were identified on their application. In its opposition papers, the City of Detroit strongly disagrees, contending that the Plaintiffs' motion is without merit and should be rejected.

The City of Detroit contends that it was advised by MLS Signs, Inc. (the company that had been hired by the Plaintiffs to construct the sign) in September 2006, "that it was no longer interested in erecting the sign."[6] The City of Detroit also claims that "it advised Plaintiffs' counsel of this in writing."[7]

In addressing this issue, Mark Zoltowski, a MLS Signs, Inc. agent, acknowledged in a sworn declaration that he had received a telephone call on September 11, 2006 from Joe Maples, a representative of the City of Detroit's Buildings and Safety Department, who inquired about the status of the K&P's revised application for the approval of erection of the "Hustler" signs. Zoltowski, in noting that the permit application was nearly two years old, "assumed that the client

---

[5]The Plaintiffs' first motion for the entry of a partial summary judgment was granted in part, and denied in part, by the Court on August 6, 2007. The Court found the City of Detroit's adult use zoning provisions to be unconstitutional, but declined to grant the Plaintiffs' request for an injunction which would have barred its enforcement.

[6]Reply Brief, City of Detroit at 1.

[7]The City submits that it has misplaced this document but will attempt to obtain it and provide copies for the Court and Plaintiffs if and when it is located. Reply Brief, City of Detroit at 2.

did not wish to pursue the application further,"[8] and advised Maples that the application should be withdrawn. A ratification letter was forwarded to the City shortly thereafter.[9]

In a letter on July 26, 2007, MLS Signs, Inc. was advised by the City of Detroit's Buildings and Safety Department that if it desired to proceed with the sign permit application, the following documentation would be required in order to complete the process: (1) a site plan that would identify the size and location of all existing and proposed signs; (2) digital photographs of all four side elevations of the building; and (3) an approval letter from the traffic engineering division of the Department of Public Works.[10]

---

[8]Reply brief, City of Detroit, Exhibit 2 at 2.

[9]The Plaintiffs contend that they were not aware of the "withdrawal" of the sign permit application until the City of Detroit filed its response to their summary judgment motion in June 2007.

[10]It should be noted that the letter, which has been outlined below, was proffered by the City of Detroit during a hearing before the Court on January 29, 2008. However, the Plaintiffs assert that they never received a copy of this letter and were not familiar with its contents. The letter was subsequently marked by the City of Detroit as its "Supplemental Exhibit 1." The letter reads as follows:

"As you will recall, last year your company informed our Department that it wished to withdraw the sign permit application you previously submitted for the business located at 415 E. Congress. Accordingly, our Department discarded the application and related materials.

We have been informed that your company does wish to proceed with the sign application. We have been able to obtain a copy of the application you previously submitted. However, in order to process the application and determine whether your proposed signs comply with the requirements of our sign ordinance, we will need three (3) copies of the following additional documents or information:

1. A fully dimensioned, drawn to scale site plan indicating the location and size of all existing and proposed signs;
2. Digital pictures of all 4 side elevations of the building indicating the sizes of all existing and proposed wall graphics, wall, roof, and projection signs, including all the window signs within three (3) feet of the interior of the door or window; and
3. An approval letter from the Traffic Engineering division of the Department

II.

The signs in question are regulated by the City of Detroit's municipal code and its zoning ordinance. In this litigation, the Plaintiffs have specifically challenged the constitutionality of (1) Articles V and VII of Chapter 3 of the Detroit City Code, and (2) Article VI and Section 61-16-173 of the zoning ordinance.

Section 3-5-1 of the City of Detroit's municipal code reads that "(i)t shall be unlawful to erect, install, construct, or alter any sign until a permit has been issued." Section 3-5-5 states that "[t]his article shall be enforced by the Buildings and Safety Engineering Department." The other sections within this Article require that signs be maintained in good repair (§3-5-2), that obsolete signs be removed (§3-5-3), and that unused roof sign supports be removed (§3-5-4). Finally, Section 3-5-6 of the City of Detroit's municipal code provides for the removal of signs that are not in compliance with this section.

Section 3-7-1 states that its purpose is "to regulate business signs within the City of Detroit," for the purpose of reducing motorist distraction, promoting public convenience, preserving property values, and enhancing the aesthetic appearance and quality of life in Detroit. Section 3-7-2 provides definitions for its terms and phrases. As an example, a business sign is defined in this Section as a "sign, at least seventy-five (75) percent of whose area is devoted to directing attention to the principal business or profession conducted, or to the principal type of commodity, service, or entertainment sold or offered on the premises on which the sign is located. . . ." Section 3-7-2 also provides definitions for such terms as awning sign, building frontage, double-faced sign, electronic message board sign, ground sign, individual letter sign, painted wall

of Public Works."

graphic, roof sign, sign, wall sign, and window sign. Section 3-7-3 of the City of Detroit's

municipal code establishes the requirements for business signs.[11] Sections 3-7-4 and 3-7-5 outline

the restrictions on maximum business sign area, as well as how to calculate the size of business

_____

[11]Sec. 3-7-3 states:

It shall be unlawful to erect or maintain a business sign except in accordance with the following requirements:

(a)    Business signs shall not cover or conceal architectural features of the building, including, but not limited to, windows, arches, sills, moldings, cornices, and transoms.

(b)    Electronic message board sign space within any business sign shall not comprise more than forty (40) percent of the total sign area.

(c)    Inflatables, balloons, and similar devices shall be allowed for the promotion of a special event only upon application for and issuance of a temporary sign permit by the buildings and safety engineering department. However, advertising of a product or service in this matter shall be prohibited except as a part of the promotion of the special event. Inflatables, balloons and similar devices may be shaped or formed like a product, may have commercial copy, and shall meet the following restrictions:

    (1)    Be limited in placement to fifteen days;

    (2)    Be placed on the premises as determined by the buildings and safety engineering department; and

    (3)    Be limited in placement to no more than two permits per year.

(c)[sic]    Where the individual sections of an individual letter sign are connected by a common structure, commonly known as a "raceway," which provides for the electrical and/or mechanical operation of sign, the raceway must be painted to match the color of the building or other structure to which the sign is mounted, and must be limited to a height of no more than one-half of the tallest letter.

(d)    The following illumination standards shall apply to all business sign types except where other specific standards apply:

    (1)    Signs may be illuminated, and signs over one hundred (100) feet from existing developed residential property or property which is designated in the master plan as appropriate for future residential development, may flash or blink.

    (2)    No sign shall be illuminated in a manner that interferes with the effectiveness of an official traffic sign, traffic signal or traffic control device.

    (3)    Illuminated signs shall be arranged to reflect light away from residential structures.

(e)    The tubing in neon signs may be encased so as to protect it from weather and breakage, and the enclosure, for example tinted glass or plastic, shall be designed to render such tubing invisible when not illuminated.

signs. Section 3-7-6 establishes the restrictions on business signs in specific locations, and Section 3-7-7 provides for the removal of those business signs that are not in compliance with this ordinance.

Article VI of the City of Detroit's zoning ordinance is twenty-four pages long, and sets forth the regulations for those signs within the various zoning districts. Sections 61-6-2 through 61-6-23 contain definitions of various types of signs, including advertising signs (§61-6-3), animated signs (§61-6-4), billboards (§61-6-6), business signs (§61-6-7),[12] directional signs (§61-6-8), double faced signs (§61-6-9), electronic message boards (§61-6-10), flashing signs (§61-6-12), freeway advertising signs (§61-6-13), identification signs (§61-6-14), illuminated signs (§61-6-15), institutional bulletin signs (§61-6-16), painted wall graphic signs (§61-6-17), political signs (§61-6-18), portable signs (§61-6-19), projecting signs (§61-6-20), real estate signs (§61-6-21), temporary signs (§61-6-22), wall, roof or ground signs (§61-6-23).

Sections 61-6-31 through 61-6-47 set forth the regulations for the height, area, setbacks, and the spacing requirements of the signs, as well as the zoning districts in which different types of signs may be located. Sections 61-6-51 through 61-6-74 ("Division 3: Advertising Sign Regulations") contain regulations which deal specifically with advertising signs. Sections 61-6-81 through 61-6-119 identify the types of signs that are allowed in the various zoning districts, and set forth the conditions which relate to such things as the height, area, projection and illumination of a sign.

Noteworthy, Section 61-6-31 warns that "no sign shall be erected, affixed, or displayed without a permit." Although Sections 61-6-56 and 61-6-59 through 61-6-63 describe the process

---

[12]The definition of business sign in §61-6-7 is the same as the definition provided in the Detroit City Code at §3-7-2.

that an applicant must follow as a prerequisite for obtaining an advertising sign permit, there is no definitive process which proscribes the route that entrepreneurs must follow in order to obtain a business sign permit that satisfies the parameters of Article VI.

Section 61-16-173 defines approximately twenty-eight sign-related terms that are found throughout the zoning ordinance. This section includes definitions which apply to a variety of signs, such as an "advertising sign," a "business sign," and a "billboard sign." Significantly, there is no mention of the permit application process in this Section.

### III.

In 1986, the Supreme Court opined that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). At the same time, the language in Federal Rule of Civil Procedure 56(c) indicates that a motion for a summary judgment should be granted only if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Here, the burden is on the movant to demonstrate the absence of a genuine issue of a material fact. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In assessing the merit of a summary judgment motion, the court must examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party. Fed. R. Civ. P. 56(c); see *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962); *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). Thus, it is the responsibility of the court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

A dispute is genuine only "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Id.* at 248. Hence, a summary judgment must be entered if (1) the submitted evidence in support of the dispositive motion clearly suggests that the contested matter is "so one-sided that [the proponent] must prevail as a matter of law," *id.* at 252, or (2) the opponent fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Upon such a showing, the non-moving party must act affirmatively in order to avoid the entry of a summary judgment. Fed. R. Civ. P. 56(e). Importantly, the presentation of a mere scintilla of supporting evidence is insufficient. See *Anderson*, 477 U.S. at 252, quoted in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). Indeed, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

IV.

Article III of the United States Constitution limits the jurisdiction of federal courts to justiciable "cases or controversies." *Whitmore v. Arkansas*, 493 U.S. 149, 155 (1990). In order to satisfy the constitutional requirements of Article III on the issue of standing, a plaintiff must establish three elements; namely, that (1) an "injury in fact" has been sustained in the form of an invasion of a judicially cognizable interest which is (a) concrete and particularized, and (b) actual or imminent, as opposed to being conjectural or hypothetical, (2) there is a causal connection between the injury and the accused conduct of the tortfeasor; and (3) it is likely - not speculative - that the injury will be redressed by a favorable decision. *Lugan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

In addition, "[a] plaintiff who has established constitutional injury under a provision of a statute as applied to his set of facts may also bring a facial challenge, under the overbreadth

doctrine, to vindicate the rights of others not before the court under that provision." *Prime Media,*

*Inc. v. City of Brentwood*, 485 F.3d 343, 350 (6th Cir. 2007). Therefore, "the critical inquiry is

whether the plaintiff can allege an injury arising from the specific rule being challenged, rather than

an entirely separate rule that happens to appear in the same section of the municipal code." *Id.* at

351.

At the outset, the City of Detroit argues that the Plaintiffs do not have standing to challenge

any of the ordinances that have been incorporated by them in their motion for summary judgment.

It is the position of the City of Detroit that they lack standing to challenge any portions of the

zoning ordinances at issue which relate to non-business signs, such as advertising signs, or political

signs. In response, the Plaintiffs assert that they are challenging the constitutionality of the entire

application process, as it applies to all signs. They also claim that a particularized injury to each

challenged provision need not be demonstrated because "the prior restraint of a licensing provision

coupled with unbridled discretion itself amounts to an actual injury." *Prime Media*, 485 F.3d at 351.

On the basis of the current record and especially when applying the presumptive standards

that are always associated with summary judgment motions, it is clear that the Plaintiffs have

suffered an "injury in fact."  In 2004, they applied for a sign permit which has not been acted upon

by the City of Detroit as of this date. Because of this delay in receiving a decision upon their

application, the Plaintiffs have been unable to erect a sign that would inform the general public of

their business purpose and location. In addition, there is evidence which suggests that there exists

a causal connection between the permit application process and the injury about which the Plaintiffs

have complained. Finally, it is likely that their claimed injury would be redressed by a favorable

decision if the permit application process is declared to be unconstitutional.

Perhaps the question of standing is better characterized as an issue of severability. Here, the

City of Detroit argues that the Plaintiffs' overall challenge to the sign ordinances encompasses provisions which have not caused any direct or indirect impact upon them, citing, as an example, the definition of, and the regulations pertaining to, advertising signs. However, inasmuch as the Plaintiffs have challenged the entire permit application process, the Court must now seek to determine if any portion of this process is unconstitutional.

V.

A licensing scheme which conditions an expression on the licensing body's prior approval of the content of the proposed speech presents peculiar dangers to constitutionally protected speech. *Freedman v. Maryland*, 380 U.S. 51, 57 (1965). In *Freedman*, the Supreme Court confronted a state law that had established a system of prior restraint for motion pictures, which required every film to be submitted to a designated municipal authority (i.e, Board of Censors) as a predicate to its distribution and publication at any public location in the state. *Id*. Under this law, the Board of Censors was given the authority to reject films which contained characteristics that it considered to be "obscene" or tended to "debase or corrupt morals or incite crimes." *Id*. at 52, n. 2. In its decision, the Supreme Court in *Freedman* found the challenged licensing scheme to constitute a prior restraint on the freedom of speech.

Prior restraints on speech carry a presumption of invalidity if it places an "unbridled discretion in the hands of a government official or agency. . . ." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990). Prior restraints must have specific standards with which to guide the decision maker in seeking to determine if an appropriate license should be issued. *City of Lakewood v. Plain Dealer Publ'g Co*., 486 US 750, 757-8 (1998). Second, a "prior restraint that fails to place limits on the time within which the decision-maker must issue the license is impermissible." *FW/PBS* at 226.

Here, it is the Plaintiffs' position that the City of Detroit's sign ordinances should be subjected to a prior restraint analysis. In support of this contention, they argue that the City of Detroit requires all property owners to apply for, and receive, a permit from a designated municipal authority as a prerequisite to the publication of a sign – a process that, in their opinion, is a scheme which constitutes a prior restraint on speech.

The City of Detroit takes issue with this argument, arguing that the sign ordinances in question constitute a restriction which is content-neutral in time, place and manner. In *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), the plaintiffs challenged a policy that required all individuals to obtain a permit before holding events in the park which involved more than fifty people or the use of an amplified sound. The Supreme Court found that this policy did not constitute a prior restraint because it was not "subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum." *Thomas*, 534 U.S. at 322. The *Thomas* Court, after declaring that "none of the grounds for denying a permit has anything to do with what a speaker might say," *id*., also opined :

> We have never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in *Freedman*. A licensing standard which gives an official authority to censor the content of a speech differs *toto coelo* from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like. *Id.*

Here, the Plaintiffs counter that the City of Detroit's sign ordinances are not content-neutral because they differentiate between types of prohibited speech, such as those signs which relate to business and advertising. Although the City of Detroit makes a distinction between on-premises signs (e.g., business) and off-premises signs (e.g., advertising), this does not necessarily make the challenged ordinance content-based. In *Wheeler v. Commissioner of Highways*, 822 F.2d 586, 589 (1987), the Sixth Circuit Court of Appeals opined that "the on-premises/off-premises distinction

does not constitute an impermissible regulation of content just because the determination of whether a sign is permitted at a given location is a function of the sign's message."

Here, there is no evidence that the City of Detroit has given preference to either type of speech. Rather, these ordinances merely provide a way of categorizing various types of signs for regulation. There is nothing within the text of the ordinances which directs municipal officials to consider the content of the proposed sign when determining whether to approve or disprove an application. Thus, the proper constitutional standard here is time, place and manner, as set forth in *Thomas*.

In order for a "content-neutral time, place and manner" regulation to be constitutional, it (1) must not be based on the content of the message, (2) must be narrowly tailored to serve a significant governmental interest, and (3) must leave ample alternatives open for communication. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *Thomas*, 534 U.S. at 323, n. 3.

In order to satisfy the constitutional test, the ordinance at issue must not allow the decision maker to reject an application because of the message that it contains. No consideration for the content of the sign – other than whether it is an on-site "business" sign as opposed to an off-site "advertising" sign – is included in the City of Detroit's sign ordinances. As such, it is the opinion of the Court that these challenged ordinances are content-neutral.

The next question to be addressed by this Court is whether the City of Detroit's sign ordinances are sufficiently narrowly tailored to serve the substantial interests of government. *Thomas*, 524 U.S. at 323, n. 3. Here, Article VII of Chapter 3 of the City Code ("Regulation of Business Signs") states that its purpose "is to regulate business signs within the City of Detroit; to limit the abundance of signs in order to reduce motorist distraction and loss of safe sight distance;

to promote public convenience; to preserve property values; to support and complement land use objectives as set forth in the city's master plan and ordinances; and to enhance the aesthetic appearance and quality of life within the city."

Safety and aesthetics are legitimate governmental interests that may be furthered through sign ordinances. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 509-510. At issue in this case, however, is whether the ordinances in question are narrowly tailored to serve those interests. At the outset, the Plaintiffs argue that the ordinances are not narrowly tailored because they do not specifically identify the grounds upon which the City of Detroit, through its Buildings and Safety Engineering Department, may use to determine whether to grant or to deny an application. In their view, "(n)owhere does the [Detroit sign ordinance] state that an application can only be denied for 'x, y, or z' reasons."[13] In response, the City of Detroit argues that the Court should construe the sign ordinances as allowing only permit applications to be denied for the reasons that have been stated in the ordinance. For example, Section §3-7-3[14] provides various specifications for business signs. Using this ordinance as an example, the City of Detroit argues that it may only deny a permit application because of the applicant's failure to comply with this provision. Thus, the City of Detroit submits that objective criteria are the grounds that are utilized when considering permit applications.

The Supreme Court has held that it is proper for federal courts to adopt a narrow construction of ordinances or state laws if, while doing so, it will eliminate constitutional infirmities. In *Ward v. Rock Against Racism*, 491 U.S. 781, 795-796 (1989), the Court declared that "in evaluating a facial challenge to a state law, a federal court must . . . consider any limiting

---

[13]Plaintiffs' Reply Brief at 12.

[14]*Supra*, n. 5.

construction that a state court or enforcement agency has proffered."

In the case at hand, the City of Detroit has urged the Court to read its sign ordinances as only permitting the denial of a permit for those grounds that have been outlined in the ordinance. On the other hand, the Plaintiffs have asked the Court to read the ordinances as allowing the rejection of an application for any reason. The Court believes that the City of Detroit's position is the more reasonable, logical and legally supportable argument. The requirements in provisions like Section 3-7-3 are specific and narrowly tailored. Thus, it is reasonable to read and construe this ordinance as requiring permit applications to comply with those requirements.

The final consideration in evaluating a time, place, or manner restriction is whether the restrictions that are imposed upon applicants, such as the Plaintiffs in this lawsuit, "leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, (1984). The City of Detroit's sign ordinances permit the publication of signs that meet the City's height, size, and other criteria.

VI.

The Plaintiffs also argue that the holding by the Supreme Court in *Thomas* imposed two additional tests upon a content-neutral time, place and manner restriction; namely, that a permit application must (1) be decided within a specific and reasonable time, and (2) be "subject to effective judicial review."[15]  In support of its time limit requirement, they argue that the  failure of a municipal government to place a time limit upon the decision maker "is a species of unbridled discretion." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990).

In *Thomas*, the Supreme Court noted that the ordinance at issue required that applications must be processed within a specified period of time. However, the Court did not state that such time

---

[15]Plaintiffs' Reply at 6 -10.

limits were required, and instead stated, quite clearly, that because the ordinance was content-neutral, it did not have to meet any of the *Freedman* requirements. The Plaintiffs' argument (namely, that time limits are required for content-neutral ordinances) would have the practical effect of merging the *Freedman* test with the relaxed standard in *Forsyth* and subsequently adopted by *Thomas*.[16]

The Plaintiffs also insist that *Thomas* mandates that those permit regulations which impact upon the right of free speech must specifically require the governmental authority to state the reasons why a permit was denied. While the Supreme Court did recognize that the regulations at issue in *Thomas* required the city to state the reasons for the rejection of the permit, there is nothing within its opinion which suggested that such a requirement was absolutely necessary. Absent the proffer of other authority, the Court will not add any additional requirements onto the content-neutral, time, place and manner standard in *Forsyth*. 505 U.S. 123.[17]

---

[16]In *Southern Oregon Barter Fair v. Jackson County*, 372 F.3d 1128 (9th Cir. 2004), the Ninth Circuit Court of Appeals specifically rejected this argument, stating:

> In discussing why the content-neutral ordinance in *Thomas* adequately limited the discretion of the decision-maker, the Court observed that the ordinance required the municipality to process applications within 28 days. But the Court did not indicate that the deadline was an essential component of a reasonable time, place and manner regulation. To read the opinion that way would flatly contradict the decision's clear holding that time, place and manner regulations need not contain the *Freedman* standards. *Thomas,* 534 U.S. at 322-23. Despite the Court's reference to the 28-day deadline, therefore, we conclude that the procedural safeguards doctrine is relevant only to explicit censorship schemes, not to content-neutral schemes.

*Southern Oregon Barter Fair v. Jackson County*, 372 F.3d at 1138.

[17]In *Southern Oregon Barter Fair v. Jackson County*, 372 F.3d 1128 (9th Cir. 2004), the Ninth Circuit Court of Appeals specifically rejected this argument, stating:

> In discussing why the content-neutral ordinance in *Thomas* adequately limited the discretion of the decision-maker, the Court observed that the ordinance required the municipality to process applications within 28 days. But the Court did not indicate that the deadline was an

VII.

The Plaintiffs have brought a facial and an "as applied" challenge to the City of Detroit's sign ordinances. For the reasons stated above, the Court has determined that the municipal sign ordinances at issue are not unconstitutional on their face. However, Plaintiffs also submit that the City of Detroit's failure to act upon their sign permit applications for over a span of three years renders the challenged ordinances unconstitutional at least as it has been applied to them. The City of Detroit has neither responded to this argument nor provided the Court with any rationale, explanation or justification for its inaction (i.e., allowing the Plaintiffs' sign application permit to remain dormant for so many years). The letter of July 26, 2007 from the City of Detroit's Buildings and Safety Engineering Department (which was initially given to the Court and the Plaintiffs during the hearing on January 29, 2008) sought additional information in order to process the 2004 sign permit applications. Although this letter was presumptively addressed to MLS Signs, Inc. it was neither forwarded nor copied to the Plaintiffs who are the real parties in interest in this litigation.[18] Even if this letter could serve as a partial explanation for the City of Detroit's inaction on the sign permit applications, it was mailed two and a half years from the date of the original application.

The multi-year delay in acting upon the Plaintiffs' sign permit applications has violated

---

essential component of a reasonable time, place and manner regulation. To read the opinion that way would flatly contradict the decision's clear holding that time, place and manner regulations need not contain the *Freedman* standards. *Thomas,* 534 U.S. at 322-23. Despite the Court's reference to the 28-day deadline, therefore, we conclude that the procedural safeguards doctrine is relevant only to explicit censorship schemes, not to content-neutral schemes.

[18]The Plaintiffs' first sign application permit identifies 415 East Congress, LLC as the "owner of the sign," while the second application identified "Steven R Johnson" as the owner. "MLS Signs, Inc." was only identified on the first application as the "erector" of the sign.

their fundamental right to engage in free speech under the First Amendment of the United States Constitution. Under these circumstances, the Court declares that the sign permit application, as it has been applied to the Plaintiffs under the circumstances of this lawsuit, is unconstitutional. Furthermore, the Court also determines that Plaintiffs are legally entitled to erect the signs which have been described on their sign permit applications.

Accordingly, the Court grants in part, and denies in part, the Plaintiffs' motion for summary judgment. In rendering this decision, the Court finds that the City of Detroit's sign ordinances are not unconstitutional on their face. As a consequence, the Court will decline the Plaintiffs' request for an order that would permanently enjoin all enforcement of these provisions by the City of Detroit. However, the City of Detroit's treatment of the Plaintiffs in this matter is declared to be unconstitutional because of its failure to make a final determination on their application within a reasonable amount of time. Therefore, the Court concludes that the Plaintiffs are legally entitled to erect the signs that were described on their sign permit application, and, in so doing, permanently enjoins the City of Detroit from preventing them from erecting and publishing these signs; provided, however, that the Plaintiffs' publication of the signs must fully conform with the existing ordinances, codes and related regulations.

IT IS SO ORDERED.

Dated:  February 14, 2008                          s/ Julian Abele Cook, Jr.
        Detroit, Michigan                          JULIAN ABELE COOK, JR.
                                                   United States District Court Judge


Certificate of Service

I hereby certify that on February 14, 2008,  I electronically filed the foregoing with the Clerk of the Court using the ECF system, and I further certify that I mailed a copy to the non-ECF participant(s).

                                                   s/ Kay Alford
                                                   Courtroom Deputy Clerk